May it please the court, Nathan Holcomb for Petitioner Sukdev Singh. If I may, I'd like to reserve two minutes of my time for rebuttal. Sure. Petitioner Singh is an Indian Sikh who applied for asylum, withholding of removal, and cat protection based on his history of mistreatment as a result of his participation in Sikh political activities, as well as a threat of future persecution. Singh submitted in support of his applications a State Department country report detailing the arrest of the leader of his political party, Simran J. Singh Mann, as well as a letter from Mr. Mann himself, describing Singh's involvement in the party and warning that Singh risked persecution, torture, and even death if he returned to India. Let me get to what's concerning me about this case. The immigration judge's oral decision insists that your client was given ample opportunity to corroborate evidence to back up some of his claims, and yet he never did. What is your response to that? The immigration judge in the first oral decision? Yes. In the first oral decision, well, first of all, the transcripts of the first hearing the BIA found was incomplete. So our record of what happened during that first hearing is inherently unreliable. The immigration judge did make an issue of whether Singh had presented adequate corroboration, but tried to shift the emphasis on the kind of corroboration that Singh might have provided to evidence that was not reasonably obtainable. Well, one of the bases of the BIA's decision, I think the IJ as well, was that the doctor's note that he obtained didn't really support his statement that he had been beaten and been injured by beating. The doctor's note said, well, it looked like there was a problem with the circulation in his shoulder or words to that effect. And the BIA notes that he could at least have gotten affidavits from family or whatever to corroborate his story about being beaten. So what do we do with that, with that problem? Well, what the BIA seems to have been focused on was actually the BIA and drawing on the IJ's reasoning suggested that Singh could have gotten an affidavit from that doctor who had treated him back in 1987. And then the IJ referred in passing to the possibility of obtaining affidavits from family members. Now, this was by the second hearing. At the time of the second hearing, as Singh testified, he hadn't been in contact with family members for six months. He hadn't been able to obtain any affidavits from family members. I think what's important to recognize here is that the agency shifted the attention in trying to poke holes in the evidence that Singh did offer relating to events that were long past, even as it ignored a letter from the leader of Singh's political party describing his arrest just the preceding year and stating that if Singh is returned back to India now, he faces the risk of persecution and torture and even death. The agency placed an impossible burden on Singh by requesting that, or requiring that he had submitted doctor's reports from doctors who had treated him over 20 years ago and school records that were in India related to his very early educational history, even as it ignored the evidence that was right in front of it and that Singh had presented. During the second hearing, Singh specifically tried to direct the IJ's attention to documentary evidence that he had, and the IJ rebuffed him and said just answer the question. Now, of course, Singh could be expected to answer a question that would be. Is there anything in the record, I know that's referenced in your brief, but all I saw in the transcript was here I have this paper and the IJ says just answer the question, but I couldn't see anything in the transcript that indicated what the paper was or anything in the record that indicated what the paper was. Now, you say it was the letter from the leader of his party, but is there anything corroborating that? I would want to represent to the court that that paper that Singh had definitely had to be that letter from, I don't think the record is clear on exactly what the documentary evidence was that Singh presented at that moment when he was rebuffed by the IJ. The broader point is that Singh did try to make an opening with the IJ and say, look, I've got a documentary evidence, and the IJ just didn't allow him to go forward with presenting any documentary evidence whatsoever, and that there's no dispute that that evidence was in the record that was submitted by the first hearing. And in Aguilar-Ramos, this court said that as a rule, it's reversible error for the agency to fail to consider a State Department country report. Here, the State Department country report is especially probative because it references specifically the arrest of an individual, the leader of Singh's party, from whom Singh had submitted a signed and sealed letter. So the rule of Aguilar-Ramos straightforwardly requires a reversal. Tell us a little bit about the history of this party and what brought a lot of these troubles about. The evidence in the record is that Singh has been associated with Sikh political organizations since his student days. He supported this with testimony, which the agency ultimately did not find credible, but for reasons as detailed in my brief are inconsistent with this court's precedent. And he testified that in 1987 he was detained by the police while he was on his way to driving school after having graduated from a Finnish college a year before, and that he was detained and held for days. Well, does this go back to some defilement of the Sikhs, I think, what's it called, Golden Temple? Yes, the source of the... And all of the assassinations involved and... Yeah, the massacre at the Golden Temple in Amritsar is referenced in Singh's original application for asylum, and there is also documentary evidence that Singh submitted relating to that massacre. That was the source of the escalation in tension between Indian Sikhs and the Indian authorities. When I looked at the application for asylum and the handwritten declaration attached, I didn't see anything in there reflecting either that he was beaten in 1987 or that he was arrested in 2004 or 2005, which he discusses later. Am I missing something? Is that correct that was left out of his application? The government emphasizes what's not in the asylum application in its brief. The agency did not rely on any omissions from the asylum application in support of its decision, and this court can only affirm for grounds that are relied upon by the agency. So that's really a matter for the agency to consider after this court, I'm urging, sends the remand to the case under INS Ventura. But this court has also held that an asylum application is not faulty just because it omits some details that are later supplemented with testimony. This is not an application like the application in Husayev, where the applicant just didn't mention any political issues in his home country at all and then later came up with a wholly new story. Here, Singh, in his application, stated that the source of his troubles were his political activities and then later described in greater detail what those activities were and the consequences that had followed for him. Well, how about this adverse credibility finding that was made? Yeah, the adverse credibility finding was made on grounds that are inconsistent with this court's precedent. But there's a bigger... Be specific. I've explained why the request for additional corroboration was not reasonable because that evidence that the agency focused on was not reasonably obtainable. The agency also relied on statements that Singh made when he first attempted to enter the country, when he said that he was a citizen of Austria, had not been... Well, weren't there statements in his application concerning some of his activities when he was actually in custody? So he couldn't have carried on those activities? It stated he was working for a 7-Eleven in 2002. I think that's what Judge Preterson is referring to. When he... Singh had traveled to... In his original... When he first entered in his asylum application, during the period of 2002, Singh was traveling back and forth between... He had been traveling back and forth between India and Austria. Where is he now? Right now he's in the United States. Where is he? He's in New York. What's he doing there? I have no knowledge of that. Was he in custody? No. Is he a free man? All I have is his address. But he faces, if this court does not grant the petition for review, then he faces deportation. He was, I think, out on... He had been in custody in California, in El Centro, and had submitted a bond for release pending resolution of dispute, I believe. You know nothing about him, really? Only what's in the record. You haven't talked to him? I've spoken with him just about the appeal. My appointment is only for purposes of this appeal. Well, you remember there's a reference to his working at a 7-Eleven in San Diego? He couldn't have been working there because he was in detention at that time? And this is in his... It's in his asylum application. Asylum application. It's in AR-787 in my notes. In his asylum application, it states that he worked at a 7-Eleven. If there's... Since the agency didn't rely on what's stated in his asylum application, issues related to the asylum application will be an issue for the agency to address in the first instance upon remand. Okay, thanks. Thank you. May it please the Court? Kylie Keane on behalf of the Attorney General. If I may, one thing that didn't come up, but that I do want to kind of narrow the issues, is the idea of firm resettlement. And the government did not... The idea of what? Firm resettlement in Austria. It was one of the findings of the agency that he had firmly resettled for the 11 years that he lived in Austria, at least as to the persecution that he suffered in the 1980s in India. However, the government's brief is not entirely clear on this point, but it's... That firm resettlement finding only applies to asylum. It doesn't apply to withholding of removal or under the INA or CAT. And the agency limited that termination to the persecution that Mr. Singh claims to have suffered in the 80s and not the persecution that he suffered later on in 2004-2005. So it's a very discreet finding, and it doesn't really dispose of all the issues in the case. So the government... Well, he stayed in Austria because of the problems. It is home, right? Isn't that why he stayed there? And he would... When some of the problems eased off, he would come in occasionally, and then he'd go back. That's right. Then he got married to a young lady that his parents picked out for him. Correct. But then he went back again. And so how can he be firmly resettled? Well, because the firm... Did he get anything that was offered by the Austrian government to show that he was a permanent resident? The record does not contain any documents from the Austrian government. What the government, what DHS relied on for the immigration judge, was Mr. Singh's own testimony that he received asylum in Austria for those 11 years. So he's got testimony on the record stating that... It didn't say exactly that. It said he was a legal resident, but it didn't say he was a permanent resident or that he had been granted the right to stay there. Isn't that correct? At AR-181, he testified that he was a refugee and a protected person, and then later that he had legal residence and that he could work in Austria, and that's at AR-226. How do we know that that's equivalent to permanent residence, that he had legal permanent residence? Because the immigration judge took into consideration the factors Mr. Singh testified to, including the fact that he could work, move freely, travel internationally. But our case in our en banc decision in Maharaj seems really clear, that there has to be either specific proof that the government offered some type of official status to stay permanently, to reside permanently, or the government has to show proof that that is unobtainable, and I didn't see either of those in the record. The immigration judge was relying on Mr. Singh's testimony that he received political asylum. Right, but that doesn't work for us, right, under Maharaj? They're extrapolating that political asylum is a permanent status. He actually had legal status in Austria, and the immigration judge took from that to mean, because he was there for 11 years and traveled freely, and in fact had to provide a written statement withdrawing that status from Austria, which he testified that he did, that that is a grant of permanent status. Now, we do not have documents from Austria, that's true, and we don't have Mr. Singh on the record saying that he had permanent status, but we have other circumstantial indirect evidence, which Maharaj does allow the government to provide. But only if the government can show it's unobtainable did the government show that. To my recollection, there is no testimony on the record that discusses that issue at all. Okay. But I guess my main point, though, was that because that's such a discreet finding, and that it only applies to that very limited part of his asylum claim, that the adverse credibility determination is really what's going to determine the outcome of this case. And that is what concerns me here. In a trustee case, when an immigration judge in this circuit makes credibility determinations, they're required to present a reasoned analysis of the evidence as a whole. It seems to me in this particular case, and correct me if I'm wrong, he sort of cherry-picked things and failed, in my opinion. There were certain little inconsistencies which can be explained away. Is there – what did the IJA do to make a reasoned analysis of the evidence as a whole? Well, Your Honor, respectfully, I think that that's – the fact that the immigration judge provided these specific detailed examples is a double-edged sword because it also means that they're pointing to specific instances in the record which could also be considered cherry-picking. Now, here, the immigration judge, as affirmed by the Board, did not just provide a simple, you know, one or two inconsistencies. Maybe there are date discrepancies, which this Court has had problems with in the past in pre-real ID cases. Here, we actually have a whole picture of his testimony, and the immigration judge says, look, he had 30 years since the date of his first alleged problems in India and today. And during that time, he is traveling back and forth to India during that entire time. And he actually – He's not traveling back and forth. He's going there about once a year when he thinks it's safe for him to go back. It's not like he's commuting back and forth. Well, he's traveling there on a yearly basis during these 30 years. And, in fact, gave up the asylum status that he had in Austria to go back to India to live with his wife and children and family who reside there. So that indicated to the immigration judge a lack of subjective fear of return to India. He gave up asylum. He had it. And he freely, voluntarily gave that up to return back to India. And the immigration judge said, that evidence is to me, he does not actually fear return to India. Now, another reason that the immigration judge found that same finding was the fact that he came here in 2005 on that fake Austrian passport. And the immigration officer who apprehended him said, do you want a hearing before an immigration judge? This is your time to apply for asylum. And he said, no. I want to withdraw my application for admission on the fake passport and I want to return to Mexico, which is what he did. Now, the immigration judge said, again, that shows he does not have a subjective fear. If you were truly a refugee fleeing persecution, once you got to the United States and were offered this immigration judge hearing, you would take it. Especially a sophisticated person like this who already received a grant of asylum from another country, Austria, and eventually gave that up. He testified voluntarily he gave that up. Well, the immigration judge said it was illogical for Singh to travel to India from Austria from 1993 to 2003. That it was illogical, Your Honor? Well, what did the immigration judge say about his travel to India from Austria? Well, there are really two things. One, the immigration judge found issue, took issue with the fact that Mr. Singh's family continued to reside in India despite his status in Austria. So, in other words, he traveled back and forth to this country who allegedly persecutes him instead of bringing his family to Austria where he had status. And Mr. Singh explains this by saying simply that he made a mistake. That was his explanation for why he never attempted to relocate his family. You know, what my notes show is that the IJ didn't discuss Singh's explanation. Singh testified that he returned to India in 1993 from Austria because his mother was sick. And he got married. Then he returned to Austria. He then visited his family in India about once a year. He returned because he was not engaged in political activity in India during that time. Things in India were looking better. And he felt safe again. But after he permanently returned to India, he renewed his involvement in the Sikh separatist movement. And within months, he was arrested and beaten again. And the IJ didn't really address Singh's plausible explanation for this behavior. And the IJ didn't consider that additional incidents of persecution occurred after he permanently returned to India. I mean, this is a long, complex record. Yes. Yeah. And there was a lot of tension going on between the Sikh people and the Sikh movement and the Indian government. You had that massacre at that Golden Temple, right? Correct. And then you had some huge assassinations that went on. And this has been going on for years. Correct. What the agency finds regarding this idea of Singh moving back and forth, I mean, Mr. Singh testified that he was using his own identity, his own travel documents and passport, to travel freely back and forth. In other words, if the government still had a continuing interest in him, every single time yearly he came back into India, he's crossing back over into Indian immigration, into authorities, and he's traveling freely without incident during those years. And the immigration judge takes that to mean that there is not this continued interest and that Singh's subjective fear is just simply lacking and undercuts his credibility. Well, he said that he wasn't engaging in any political activity and that conditions were better then. Things in India were looking better and he felt safe. Then he got back and he got involved again in this separatist movement and then he was arrested, beaten again. But then he again left the country on his own passport. I mean, it just begs the question of the Indian authorities are looking for him. Why did they let him leave? I don't know. You know, India is a big country. They've got a billion and a half people. Correct. And we know that the Singhs are a persecuted minority there. Don't we know that? Yes. But the country reports indicate that much of that persecution happens in the Punjab and Mr. Singh does not live in the Punjab region. He lives in New Delhi. So on that point, it is a big country. And if the authorities at the borders are not looking for him, I think it also would be indicated through the country reports that he doesn't live in the area that's targeted. I'm sure those borders, I mean, probably the borders are pretty porous. We've got all kinds of terrorists moving back and forth, Taliban, Afghanistan, all those stands. Well, in any event, the agency determined that those multiple trips were turning back and using his own identity. I mean, the only time he had to assume an identity is when he came to the United States, ironically. He left his country freely and came here and presented a false passport to get into the United States. It then didn't apply for asylum once he got here. It wasn't until he snuck across the border that he decided in a defensive posture, after he'd been placed into removal proceedings, to apply for asylum. And the immigration judge took that to mean that he does not, in fact, have this subjective fear that's required for asylum eligibility. Well, you know, the timeline that the IJ followed didn't seem to add up. He said, Singh testified about his education in the subsequent 1987 beating. He said his testimony was consistent regarding dates of his education and graduation, what degree he earned, and when he received it, the date he was apprehended by police, how he came to be hospitalized. And at the first hearing, the IJ focused on his application that states he attended high school from June 68 to January 78. And he doesn't mention college. This was an asylum application prepared by an attorney and is just riddled with incorrect information. And this is the application that says he worked at 7-Eleven Mart in San Diego beginning in 2006. Correct. But he'd been detained in El Centro this entire time. Isn't that right? That's correct. Okay. The asylum application has multiple problems. I mean, the declaration he submitted with the asylum application says that his name is the assumed identity that had hits to terrorist ties, which is why he got detained the first time. That's not his name. Well, how did the IJ figure he was in high school for 10 years? Couldn't he see that was a mistake? I'm not sure I follow, Your Honor. The application stated he attended high school from June of 68 to January of 78. Right. Well, I think that the immigration judge did not address that. He addressed the fact that he said he graduated in 1978, which was contradictory to his testimony that he graduated later in the 80s. He doesn't address the fact that the asylum application shows he was in high school for 10 years, which he testified he was in high school for 4 years. But that particular inconsistency, which is evident on the record, was not addressed by the immigration judge. So the government is not going to rely on that. Well, there's a lot of things you can't rely on here. Yeah. There are many inconsistencies on the face of the record that the agency did not address. Yeah. That's correct. I see I'm well over my time, Your Honor. Where is he now? He is not in ICE custody, to address Your Honor's question. As far as I can agree with Mr. Holcomb that he's in New York, but he's not in custody. When was he released from ICE custody? Well, the PACER docket shows 2008, I believe. He had several addresses in California, San Diego after his release, and I guess now he's in New York. How long was he in custody? Well, he got picked up in 2006. So if the docket is correct that he was released in 2008, it looks like 2 years, approximately 2 years. Two years? Yeah. Here it is, December 2008. He notified the court of an address change to San Diego. He had several different addresses in San Diego, and that was in December 2008. If Your Honors have no further questions. Thank you. Thank you. Thank you. Well, that matter is submitted. And the next matter, United States v. Barboza, that's submitted on the briefs. And now we come to U.S. v. Ellis Garcia. Thank you. Thank you.
judges: Pregerson, Nelson D. W., Ikuta